[Cite as *In re D.W.*, 2019-Ohio-1880.]

COURT OF APPEALS
RICHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT


| | | |
|---|---|---|
| IN RE: D.W., JR., | : | JUDGES: |
| | : | Hon. William B. Hoffman, P.J. |
| | : | Hon. Patricia A. Delaney, J. |
| | : | Hon. Craig R. Baldwin, J. |
| | : | |
| | : | |
| | : | |
| | : | Case No. 19CA2 |
| | : | |
| | : | O P I N I O N |


CHARACTER OF PROCEEDING:      Appeal from the Richland County
Court of Common Pleas, Juvenile
Division, Case No. 2016 DEP 00167


JUDGMENT:      Affirmed


DATE OF JUDGMENT:      May 13, 2019


APPEARANCES:

For Plaintiff-Appellee      For Defendant-Appellant N.Z.

EDITH A. GILLILAND      JOHN C. O'DONNELL, III
Richland County Children Services      10 West Newlon Place
731 Scholl Road      Mansfield, Ohio 44902
Mansfield, Ohio 44907

*Baldwin, J.*

**{¶1}** Appellant N.Z. appeals from the January 10, 2019 Entry of the Richland County Court of Common Pleas, Juvenile Division, approving and adopting the Magistrate's Decision.

## STATEMENT OF THE FACTS AND CASE

**{¶2}** Appellant N.Z. is the mother of D.W., Jr. ("DW") (DOB 7/24/13). On December 9, 2016, the Richland County Children Services Board (RCCSB) filed a complaint alleging that D.W. was a dependent child. An amended complaint was filed December 14, 2016.

**{¶3}** On January 20, 2017, RCCSB filed a motion seeking temporary custody of D.W. As memorialized in a Magistrate's Order filed on February 6, 2017, the child was placed in the temporary custody of the agency.

**{¶4}** The Guardian ad Litem, in a report filed on October 10, 2018, recommended that D.W. be placed in the permanent custody of RCCSB. Following a hearing the Magistrate, in a Magistrates' Decision filed on March 28, 2017, found D.W. to be a dependent child and placed him in the temporary custody of RCCSB. The trial court's Judgment Entry approving the Magistrate's Decision was filed on March 28, 2017.

**{¶5}** Thereafter, on July 27, 2018, RCCSB filed a motion seeking permanent custody of D.W. RCCSB, in its motion, indicated that D.W. had been in the temporary custody of the agency for twelve or more months of a consecutive twenty-two month period and that, alternatively, D.W. could not and should not be placed with appellant within a reasonable period of time. The Guardian ad Litem, in a report filed on October 10, 2018, recommended that D.W. be placed in the permanent custody of RCCSB. A

hearing on the motion commenced on October 17, 2018 before a Magistrate. Neither appellant nor the child's father were present at the hearing, although both were represented by counsel.

{¶6}    At the hearing, Benjamin Chapman testified that D.W, had been a foster child in his home for just over two years and had some behavioral struggles that were improving. Chapman testified that D.W. was in counseling and that he and his wife intended to continue the counseling. Chapman testified that they had a fetal alcohol spectrum disorder evaluation scheduled for D.W. because they were concerned that D.W. exhibited similarities to their first adopted son who had been diagnosed with the disorder. Chapman testified that D.W. had confusion with directions and threw tantrums and fits. He testified that he and his wife had a generally positive relationship with D.W. and that he fit in with the other children in the home. Chapman testified that   D.W. called his sons brother and they called D.W. their brother and that D.W. had a relationship with Chapman's extended family.

{¶7}    Chapman testified that D.W. had visited with his mother while in their care and that D.W.'s mother did not want to talk about him a lot and was totally fine that they were taking care of her son. The more regular and closer together the visits were between D.W. and his mother, the more frequently he acted defiantly or had tantrums. Chapman testified that he and his wife wanted to adopt D.W. despite concerns over his behavioral issues. He testified that D.W. had dietary restrictions namely, a dairy intolerance and saw a lot of doctors. He further testified that D.W. was in kindergarten and was doing well and getting good reports. He testified that they had asked the school for D.W. to be evaluated for IEP (individualized education plan) services. According to Chapman. D.W. was in

speech and occupational therapy when he was first placed with them because he could not speak very well and used words incorrectly. D.W. had successfully completed speech and occupational therapy.

{¶8}    On cross-examination, Chapman testified that D.W. had last visited with his mother at least two months ago and that the visitation was "[v]ery inconsistent." Transcript at 16. He testified that appellant missed about half of the visits and that D.W. was placed with them on September of 2016.

{¶9}    The next witness to testify was Kenneth Haynes, the CASA/Guardian ad Litem. He testified that he recommended that it was in D.W.'s best interest to be placed in the permanent custody of the agency and to be available for adoption.   The following testimony was adduced when he was asked the basis for his recommendation;

{¶10}  "A: Having the time that he's been in the foster home, uh seems to uh, from my investigations, been the most uh stable environment that he's been in pretty much his whole life.  Uh, prior to being in the foster home, uh he spent time with different people. Um, uh, his mother would leave him off uh with friends or acquaintances uh for periods of time, which I believe was the reason he ended up with Children Services.  Um, the uh, his mother, [appellant], um over the two years that I've been on the case, uh was very inconsistent uh with her visitations with him. Uh, his father was in uh, in prison during uh this time, uh and not uh, not present in his life. Um, and it's been my observation that the foster family has been very uh, very bonded with him, uh very caring with him, very loving. Um, they uh, they met all of his needs.  Uh, and uh they just, he's just in a very loving and very stable environment right now."

Transcript at 22.

{¶11} Haynes testified that he was comfortable with the possibility of the Chapmans adopting D.W. and that D.W. interacted well with the other children in the Chapman home and they treated each other like brothers and sisters.    When asked about D.W.'s relationship with appellant, he testified that they seemed to have "more of a brother-sister relationship than a mother-son relationship" and that there was little physical contact between them when he saw them together. According to Haynes, appellant seldom asked D.W. questions about his life and needs and seemed more concerned about herself. He testified that appellant had rapid mood swings and displayed fits of anger and irritability. He was unsure where appellant was currently living and testified that she was not good at complying with her case plan objectives.  When asked when appellant had last visited with D.W., Haynes testified that it was two or three months before and that appellant had indicated that she was done with visitation and was not going to do any more counseling or jump through any more hoops..

{¶12} On cross-examination, Haynes testified that his last face-to-face contact with appellant was two or three months prior and that he had made attempts to contact her and had no idea where she was.   Haynes testified that he observed D.W. interact with his foster parents and that they were very concerned with him and were loving and attentive. He testified that D.W. appeared to be happy and content and at home in his placement.  He testified that D.W. called the foster parents mom and dad.

{¶13} Breanne Crossen, a caseworker with RCCSB testified that she was assigned D.W.'s case. She testified that on July 20, 2014, the agency had received a call that appellant had left D.W. in the care of a woman named Lisa and that Lisa was not able to get hold of appellant and did not have contact information for her. Appellant was

only supposed to have left D.W. in Lisa's care for a day and he had been there for three or four days. Crossen testified that D.W. did not have clothes or diapers. Crossen testified that appellant was charged with endangering children and that the day the call came in, D.W. "was safety-planned to Shaquita Miller, who had previously cared for [D.W.]." Transcript at 47.

{¶14} Crossen testified that a case plan was prepared and that the plan was filed on May 11, 2017. She testified that under the plan, appellant was to have a mental health assessment and a drug and alcohol assessment and that appellant was to have stable housing and income and parenting education.   Crossen testified that she received the case at the end of January of 2015 and that appellant had completed a mental health assessment back then at Catalyst. While appellant completed the assessment, she did nothing further. The mental health assessment recommended that appellant undergo individual counseling. Crossen testified that she did not know where appellant was for the entire year of 2015 and that  appellant had not ever indicated to her that in the one year period between February of 2015 and February of 2016, she had received any type of mental health counseling services. When appellant returned to Richland County in February of 2016, the two discussed appellant going to Catalyst, but appellant stated that she did not want to go there and decided to do a mental health assessment at Family Life Counseling. After the assessment, it was recommended that appellant receive counseling for anxiety and depression. According to Crossen, appellant attended two three counseling appointments and stopped attending after that.

{¶15} Crossen testified that appellant completed another mental health assessment with Catalyst  on May 21, 2017  and was diagnosed with anxiety disorder,

depression and alcohol abuse and that it was recommended that she complete individual counseling. Appellant attended three counseling sessions in June and July of 2017 and then stopped attending. Appellant started attending again and attended three more sessions between February 12, 2018 and April 30, 2018. Crossen was unaware of any mental health treatment that appellant was involved in. Crossen testified that it was the agency's position that appellant has not successfully completed her case plan objective for mental health. She further testified that she asked appellant to complete a drug and alcohol assessment, but that appellant did not follow through and that appellant had not successfully completed the drug and alcohol treatment component of her case plan. Crossen was unaware of appellant's current housing situation and testified that she had not seen or had any contact with appellant since June of 2018. She indicated that she could not say if appellant had stable housing since she did not know where appellant was living and that the last time she was aware that appellant was employed was in December of 2017. Appellant had had a job for a couple of months, but quit because she was trying to complete her case plan objectives. When asked if it was the agency's position that appellant had the financial ability to meet D.W.'s basic needs, Crossen testified that she did not know if appellant could provide for him since she did not know appellants' current situation. She testified that she did not believe that appellant would be able to provide for his needs. When asked the reason for her conclusion, Crossen testified as follows:

{¶16} "A: When [appellant] had him, we gave [appellant] a chance to have [D.W.] back in 2016, March, 2016--. She came up here, she moved into an apartment, she was supposed to get him into protective daycare. She did not get that set up. She did have Devall start play therapy at Family Life Counseling. She only took him to two or three

appointments and stopped taking him. She stopped taking herself to appointments.   She was unable to gain employment while he was in her care.  She lost her apartment in June, 2016.  She just has not been stable enough to be able to show that she was able to care for him."

Transcript at 59-60.

{¶17} Crossen testified that appellant successfully completed a parenting program and had successfully completed the parenting education component of her case plan. Crossen testified that appellant's visits with her son had not been consistent. She testified that she did not feel that appellant had completed her case plan objectives overall and had not resolved the problems that the agency identified in the complaint. Crossen further testified that D.W.'s father was not on the plan because he had been incarcerated.

{¶18}  According to Crossen, appellant and the child's father were both arrested in August of 2016 due to a domestic dispute. At that time, D.W. was placed in his current foster home prior to the agency filing the complaint. While the plan was for appellant to get out of jail, get stable housing and obtain services to help her that did not happen.

{¶19}  Crossen testified that she did not believe that there was much of a parent-child relationship between appellant and D.W. because appellant had not been around much since he was born. She testified that appellant had left D.W. with various people for the first 10 months of his life and that appellant "had minimal to no contact "with him. Transcript at 67. When appellant got D.W. back into her care in March of 2016, he did not really know who she was. Crossen testified that there was not a lot of hugging between the two and that when appellant hugged D.W., he did not really reciprocate unless she brought him toys or other items. At the end of the visits, D.W. would go running to his

foster mother and hug her. Crossen testified that D.W. did not call appellant mom but called his foster parents mom and dad. D.W. had minimal to no contact with his biological siblings who were in the legal custody of appellant's mother and had no bond with them or any other maternal relatives. When asked, Crossen testified that the custody of D.W. had not changed since March of 2017 and that he had been in the custody of the agency for at least 12 out of the last 22 months.

{¶20} Crossen testified that the agency had investigated other relatives for placement or custody of D.W. and that appellant's mother, who had appellant's other children, would not take him and did not want to meet him. D.W.'s paternal grandmother also did not want to take custody of him as long as appellant was working on her case plan objectives, but had reported, after the motion for permanent custody was filed, that she was willing to take legal custody of him. No home assessment had been completed. However, Crossen testified that she did not believe that it would be appropriate to pursue legal custody to the paternal grandmother since she had no bond or contact with D.W. for the last two years. Crossen testified that she was concerned that the parenting would be left to D.W.'s father and that it would not be appropriate.

{¶21} Crossen testified that she believed that permanent custody was in D.W.'s best interest because he had been passed around since he was born and was in the first stable place. She voiced concerns over appellant's ability to meet his medical concerns and educational needs. Crossen testified that D.W. was well bonded with this foster family and that he received consistent doctor visits and counseling and consistency in going to preschool.

**{¶22}** Crossen was further questioned about visitation between appellant and D.W. She testified that appellant was not consistent and would come to a couple visits and then miss several visits. She testified that it had been a period of at least 90 days since appellant had contact with D.W.

**{¶23}** On cross-examination, Crossen testified that she last had contact with appellant in June of 2018. She further testified that Shaquita Miller, a non-relative who previously had cared for D.W., had been considered for placement prior to the current foster family, but that she was denied legal custody of D.W. due to a 2005 felonious assault charge.

**{¶24}** The Magistrate, in a Decision filed on November 28, 2018, recommended that the parental rights of appellant and the child's father be terminated and that permanent custody of D.W. be granted to the RCCSB. No objections were filed. Pursuant to a Judgment Entry filed on December 17, 2018, the trial court approved and adopted the Magistrate's Decision.

**{¶25}** Appellant now raises the following assignment of error on appeal:

**{¶26}** "I. THE TRIAL COURT'S CONCLUSION THAT PERMANENT CUSTODY WAS WARRANTED IS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE."

I

**{¶27}** Appellant, in the case sub judice, argues that the trial court's decision that permanent custody was warranted was not supported by clear and convincing evidence. Appellant specifically contends that the State failed to prove by clear and convincing evidence that appellant does not meet the factors in R.C. 2151.414(E).

**{¶28}** In the case *sub judice*, appellant did not object to the decision of the magistrate. We note Juv.R. 40(D)(3)(b)(iv) states as follows: "Except for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Juv.R. 40(D)(3)(a)(ii), unless the party has objected to that finding or conclusion as required by Juv.R. 40(D)(3)(b)." To constitute plain error in a civil case, the error must be "obvious and prejudicial" and "if permitted, would have a material adverse effect on the character and public confidence in judicial proceedings." *Friedland v. Djukic*, 191 Ohio App.3d 278, 2010–Ohio–5777, ¶ 37 (8th Dist.). Plain error analysis is limited and is to be applied with the utmost caution. *State v. Tart*, 8th Dist. Cuyahoga No. 76223, 2000 WL 739518.

**{¶29}** R.C. 2151.414(B)(1) states permanent custody may be granted to a public or private agency if the trial court determines by clear and convincing evidence at a hearing held pursuant to division (A) of R.C. 215.414, that it is in the best interest of the child and any of the following apply:

**{¶30}** (a) The child is not abandoned or orphaned* * *and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

**{¶31}** (b) The child is abandoned.

**{¶32}** (c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

**{¶33}** (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period* * *.

**{¶34}** (e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

**{¶35}** As findings under R.C. 2151.414(B)(1)(a) and R.C. 2151.414(B)(1)(d) are alternative findings, each is independently sufficient to use as a basis to grant the motion for permanent custody. *In re Daltoni,* 5th Dist. Tuscarawas No. 2007 AP 0041, 2007–Ohio–5805. The trial court found that RCCSB had temporary custody of D.W. for at least twelve months of a consecutive twenty-two month period. Appellant does not challenge this finding. This finding alone, in conjunction with a best interest finding, is sufficient to support the grant of permanent custody. *In re Calhoun,* 5th Dist. Stark No.2008CA00118, 2008–Ohio–5458.

**{¶36}** However, even if we consider appellant's argument with regards to D.W., we find the trial court did not err in determining that D.W. could not and should not be placed with appellant at this time or within a reasonable period of time.

**{¶37}** Under R.C. 2151.414(E), the trial court must consider all relevant evidence before making this determination. The trial court is required to enter such a finding if it determines, by clear and convincing evidence, that one or more of the factors enumerated in R.C. 2151.414(E)(1) through (16) exist with respect to each of the child's parents.

**{¶38}** R.C. 2151.414 states, in relevant part, as follows:

{¶39} (E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

{¶40} (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

{¶41} (2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to

division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;

{¶42} (3) The parent committed any abuse as described in section 2151.031 of the Revised Code against the child, caused the child to suffer any neglect as described in section 2151.03 of the Revised Code, or allowed the child to suffer any neglect as described in section 2151.03 of the Revised Code between the date that the original complaint alleging abuse or neglect was filed and the date of the filing of the motion for permanent custody;

{¶43} (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

{¶44} (5) The parent is incarcerated for an offense committed against the child or a sibling of the child;

{¶45} (6) The parent has been convicted of or pleaded guilty to an offense under division (A) or (C) of section 2919.22 or under section 2903.16, 2903.21, 2903.34, 2905.01, 2905.02, 2905.03, 2905.04, 2905.05, 2907.07, 2907.08, 2907.09, 2907.12, 2907.23, 2907.25, 2907.31, 2907.32, 2907.321, 2907.322, 2907.323, 2911.01, 2911.02, 2911.11, 2911.12, 2919.12, 2919.24, 2919.25, 2923.12, 2923.13, 2923.161, 2925.02, or 3716.11 of the Revised Code, and the child or a sibling of the child was a victim of the offense, or the parent has been convicted of or pleaded guilty to an offense under section 2903.04 of the Revised Code, a sibling of the child was the victim of the offense, and the

parent who committed the offense poses an ongoing danger to the child or a sibling of the child.

{¶46} (7) The parent has been convicted of or pleaded guilty to one of the following:

{¶47} (a) An offense under section 2903.01, 2903.02, or 2903.03 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense was a sibling of the child or the victim was another child who lived in the parent's household at the time of the offense;

{¶48} (b) An offense under section 2903.11, 2903.12, or 2903.13 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense;

{¶49} (c) An offense under division (B)(2) of section 2919.22 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to the offense described in that section and the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense is the victim of the offense;

{¶50} (d) An offense under section 2907.02, 2907.03, 2907.04, 2907.05, or 2907.06 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those

sections and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense;

{¶51} (e) An offense under section 2905.32, 2907.21, or 2907.22 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to the offense described in that section and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense;

{¶52} (f) A conspiracy or attempt to commit, or complicity in committing, an offense described in division (E)(7)(a), (d), or (e) of this section.

{¶53} (8) The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or defect of the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body.

{¶54} (9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.

{¶55} (10) The parent has abandoned the child.

{¶56} (11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the

Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

{¶57} (12) The parent is incarcerated at the time of the filing of the motion for permanent custody or the dispositional hearing of the child and will not be available to care for the child for at least eighteen months after the filing of the motion for permanent custody or the dispositional hearing.

{¶58} (13) The parent is repeatedly incarcerated, and the repeated incarceration prevents the parent from providing care for the child.

{¶59} (14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.

{¶60} (15) The parent has committed abuse as described in section 2151.031 of the Revised Code against the child or caused or allowed the child to suffer neglect as described in section 2151.03 of the Revised Code, and the court determines that the seriousness, nature, or likelihood of recurrence of the abuse or neglect makes the child's placement with the child's parent a threat to the child's safety.

{¶61} (16) Any other factor the court considers relevant.

{¶62} Clear and convincing evidence is that evidence "which will provide in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the

syllabus. See also, *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 481 N.E.2d 361 (1985). "Where the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Cross* at 477. If some competent, credible evidence going to all the essential elements of the case supports the trial court's judgment, an appellate court must affirm the judgment and not substitute its judgment for that of the trial court. *C.E. Morris Co. v. Foley Constr. Co.,* 54 Ohio St.2d 279, 3

**{¶63}** The Magistrate, in her Decision, found that R.C. 2151.414(E)(1), (E)(4), and (E)(10) were applicable.  As is stated above in detail, there was testimony that appellant had failed continuously and repeatedly to substantially remedy the conditions causing D.W. to be placed outside his home. There was testimony that she did not maintain appropriate and stable housing or employment and went for periods of time exceeding 90 days before visiting with D.W. and that her visitation was not consistent.   The CASA/Guardian ad Litem in his report, stated that appellant has 13 eviction notices from 2005 through June of 2016.   Moreover, appellant, who previously had four other children removed from her care, had at times left D.W. with acquaintances for periods of time. There was testimony that the caseworker had not had contact with appellant since June of 2018 and did not know her current living situation and that her last known address was vacant. Appellant also sporadically engaged in services despite having three different assessments and as noted by the Magistrate "had failed consistently and repeatedly to position herself to assume the responsibilities associated with full-time care of her child." The CASA/Guardian ad Litem noted in his report, that appellant had not completed any

substance abuse assessments or services and that she did not follow through with counseling. The Magistrate, in her Decision, found that appellant had "failed to consistently make herself available to the Court, her legal representative and her caseworker."

**{¶64}** We note that appellant does not challenge the trial court's best interest finding.

**{¶65}** Based on the foregoing, we find that the trial court's decision is supported by clear and convincing evidence and that appellant has not demonstrated plain error in the findings of the court.

**{¶66}** Appellant's sole assignment of error is, therefore, overruled.

**{¶67}** Accordingly, the judgment of the Richland County Court of Common Pleas, Juvenile Division is affirmed.

By: Baldwin, J.

Hoffman, P.J. and

Delaney, J. concur.